**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TELIGENT, INC., *et al.*,[1] | Case No. 21-11332 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF VLADIMIR KASPAROV IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Vladimir Kasparov, hereby declare under penalty of perjury that the following is true and correct:

1.      I am a Managing Director at Portage Point Partners ("Portage Point") and the chief restructuring officer ("CRO") of Teligent, Inc. ("Teligent") and its above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors").[2]  As a Managing Director at Portage Point, I specialize in managing complex financial and operational restructurings.  I have over twenty (20) years' experience assisting clients, primarily in the Middle Market sector, in navigating periods of downturn, as well as providing interim management services and stepping into officer or director roles.  Prior to joining Portage Point, I spent nearly twelve (12) years with Andrews Advisory Group, where I advised leading financial institutions, including mezzanine lenders, hedge funds and private equity funds during corporate restructurings and operational turnarounds, specifically involving companies that were experiencing various forms of distress.

2.      Prior to being appointed CRO, I worked with the Debtors in connection with various business and financial analysis and projects since September of 2021.  As a result of my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Teligent, Inc. (5758); Igen, Inc. (7443); Teligent Pharma, Inc. (1639); and TELIP LLC (8395).  The Debtors' corporate headquarters is located at 33 Wood Ave, 7th Floor, Iselin, NJ 08830.

[2] As used herein, the "Company" refers to the Debtors and their non-debtor affiliates, collectively.

experience with the Debtors and now in my capacity as CRO, I am familiar with the Debtors' operations, day-to-day business affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases") and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First-Day Motions"). I am authorized by the Debtors to submit this Declaration.

3.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' professional advisors. If I were called upon to testify, I would testify competently to the facts set forth herein.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. No trustee or examiner has been appointed in the Chapter 11 Cases. As of the date hereof, no creditors' committee has been appointed.

5.      Part I of this Declaration provides an overview of Teligent's business and capital structure. Part II provides a discussion of the events leading to the commencement of the Chapter 11 Cases and the Company's prepetition restructuring efforts. Part III affirms and incorporates the facts that support the relief requested in the First-Day Motions.

## INTRODUCTION

6.      The Company markets and sells, under its own label, generic topical, branded generic, and generic injectable pharmaceutical products in the United States and Canada.  The Company's laboratory and manufacturing facilities are located in Buena, New Jersey, its corporate headquarters is located in Iselin, New Jersey, and it has an additional office in Toronto, Canada. As of the Petition Date, the Company employs approximately 134 individuals.

7.      Teligent's common stock is publically traded on the Nasdaq Global Select Market under the ticker symbol "TLGT".

8.      The Company has a large portfolio of generic products with core strengths in topical and injectable pharmaceutical products. The Company markets and sells certain topical pharmaceutical products in the United States, as well as various generic and branded generic injectable products and medical devices in Canada.  The Company has a diversified channel base, which spreads across, among others, retail pharmacy, source programs, distributors, hospital GPOs, specialty, and animal health.  The Company also has a contract manufacturing and private label business, through which they provide contract manufacturing services to the pharmaceutical, over-the-counter, and cosmetic markets. The Company's products are used in a wide range of applications from cosmetics and cosmeceuticals to the prescription treatment of conditions like dermatitis, psoriasis and eczema.

9.      As set forth more fully below, over the last decade the Company undertook several strategic initiatives aimed at increasing their product and service offerings and modernizing and expanding their facilities to position the company for continued growth.  Unfortunately, despite the success and promise of certain of these initiatives, a combination of regulatory and legal setbacks and unfavorable macroeconomic conditions, including most notably the COVID-19

pandemic and the FDA Warning Letter (defined below), led to decreased revenue and increased costs. The Company was able to withstand the liquidity impact of the COVID-19 pandemic and the FDA Warning Letter due, in part, to various cost-savings measures discussed herein. In addition, the Debtors obtained approximately $3.3 million in proceeds from the U.S. Small Business Administration Paycheck Protection Program (as discussed below, the "PPP Loan").

10.     In January of 2021, the Company improved its liquidity position through certain recapitalization transactions (the "January 2021 Exchange Transactions") pursuant to an exchange agreement with the Second Lien Lenders, the Second Lien Agent, and the Series C Noteholders (each as defined below), which resulted in the extinguishment of Teligent's remaining obligations under the Series C Notes, in exchange for shares of its common stock, and the conversion of $24.5 million in accrued PIK interest under the Second Lien Credit Agreement to newly created non-voting Series D preferred stock. The January 2021 Exchange Transactions reduced the Debtors' secured indebtedness from approximately $186 million to approximately $109.7 million. The Company also improved its liquidity by drawing down a delayed-draw term loan provided by the Second Lien Lenders in early February 2021, in the aggregate amount of $1,465,348.

11.     In connection with the January 2021 Exchange Transactions, the Company also entered into an at market issuance sales agreement with B. Riley Securities pursuant to which the Company would sell specified quantities of Teligent common stock through or to B. Riley (the "ATM Offering"). Through the ATM Offering, the Company raised approximately $36.9 million.

12.     Through these and other efforts, the Company materially improved its liquidity position and was poised for continued growth in 2021.

26732411.4

13.    Unfortunately, as a result of continued regulatory headwinds and macroeconomic challenges, including the renewed market-depressive effects of COVID-19 and its variants, the Company faced tightening liquidity through the second and third quarter of 2021.

14.    After considering all strategic alternatives, the Company, in consultation with their legal and financial advisors, determined that the best path to preserve and maximize the value of the Company's assets was the commencement of the Chapter 11 Cases and implementation of a comprehensive marketing process and sale of the Debtors' assets.

## PART I

## THE BUSINESS

### A.    The Company's History

15.    Teligent was incorporated in Delaware in 1977 as IGI, Inc.  In 2008, IGI, Inc. became IGI Laboratories, Inc. and, in late 2015, IGI Laboratories became Teligent.

16.    The Company has been in the business of contract manufacturing and the development of topical pharmaceutical products since the early 1990's.  Since approximately 2010, however, the Company has been focused on the growth of their own generic pharmaceutical business, including transitioning its business to include more customers in the topical pharmaceutical industry.

17.    In 2014, the Company broadened its primary target product focus from topical pharmaceuticals to include a wider array of specialty pharmaceutical products, including injectable generics, complex generics, and ophthalmic generics, leveraging the company's existing expertise and capabilities in an effort to broaden their platform for a more diversified strategic growth.

18.    In 2018, the Company was recognized by the United States Food and Drug Administration (the "FDA") as one of the top 15 generic companies to receive Abbreviated New Drug Application ("ANDA") approvals.  ANDA approvals allow the Company to launch new

products, and thus are a significant factor in the achievement of the Company's' long-term strategic goals. In 2019, the Company received five (5) new ANDA approvals from their internally developed pipeline of topical generic products and, as of the Petition Date, has approximately eighteen (18) ANDA requests pending before the FDA.

**B.      The Buena, New Jersey Facility Expansion**

19.      As part of their strategic growth initiative, beginning in 2015, the Company undertook an expansion of their headquarters, laboratory, and manufacturing facility in Buena, New Jersey (the "Buena Facility"). The first phase of the Buena Facility expansion, which included a complete interior renovation and a new product development laboratory for work on topical and sterile pharmaceuticals, was finished in July of 2016.

20.      In October 2018, the Company received authorization to begin using the renovated manufacturing facility, which includes a state-of-the-art quality control and microbiology lab for the testing of pharmaceutical products. This substantially increased the Company's manufacturing capability for topical products and enabled the production of sterile injectable products in both vial and ampule presentations. The Company also used the Buena Facility expansion as an opportunity to upgrade and improve the degree of automation and capacity in their existing topical production suite; in that regard, the upgraded facility includes a versatile vial and ampule filling line capable of completing between four (4) and eight (8) million units per year, with space and critical utilities included in the build-out for a potential higher-speed filling line that could increase future production to forty (40) million units per year or more.

**C.      The Company's Organizational Structure**

21.      A corporate organizational chart is attached hereto as **Exhibit A**.

22.     Teligent, the direct or indirect parent of each of the other Debtors, is the 100% owner of Igen, Inc. ("Igen") and non-debtor Teligent Luxembourg S.a.r.l. ("Teligent Luxembourg"). Igen is the 100% owner of Teligent Pharma, Inc. and Teligent Luxembourg is the 100% owner of non-debtors Teligent Canada and Teligent OU.[3]

23.     On November 13, 2015, Teligent Canada acquired all of the rights, title and interest in the development, production, marketing, import and distribution of all products of Alveda Pharmaceuticals Inc. ("Alveda"). In connection with the completion of the acquisition, the Company formed Teligent Luxembourg, a private limited company incorporated under the laws of the Grand Duchy of Luxembourg, Teligent OÜ, a private limited company incorporated under the laws of the Republic of Estonia, and Teligent Canada, a company incorporated under the laws of the Province of British Columbia.

24.     Teligent Canada currently has one (1) employee located in the Debtors' office in Toronto, Canada. Teligent Canada acquired all of the Alveda working capital, including accounts receivable, inventory, accounts payable, and capital assets. In addition, Teligent Canada acquired Alveda's existing customer relationships, all contracts necessary to execute the Debtors' Canadian distribution activities, operational permits, and all intellectual property required to operate the marketing and distribution of the Debtors' products in Canada. Teligent Canada currently markets twenty-eight (28) products, with three (3) additional approved products pending launch in 2022.

**D.      The Debtors' Capital Structure**

25.     The Debtors' outstanding senior credit facilities consist of: (i) the First Lien Revolving Credit Facility; (ii) the Second Lien Term Loan Facility; and (iii) the Series D

---

[3] Teligent OU is an Estonian corporate entity. In late 2020, the Company repositioned its research and development operation, mainly performed out of an office in Tallinn, Estonia, to the Buena Facility. The Company divested its limited assets in Estonia and, as of the Petition Date, had begun formally dissolving its Estonian operations.

Convertible Notes (each as defined and discussed more fully below). In addition, the Debtors have various trade debts and other outstanding general unsecured obligations.

26.    As of the Petition Date, the Debtors' outstanding obligations in connection with the foregoing are estimated at no less than the following amounts:

| Type | Amount Outstanding |
|---|---|
| First Lien Revolving Credit Facility | $16,441,527.34 |
| Second Lien Term Loan Facility | $86,661,929.76 |
| Series D Convertible Notes | $296,943.06 |
| PPP Loan | $3,349,094.12 |
| Trade / Other General Unsecured Obligations | $23,000,000.00 |

### a.    The Senior Secured Credit Facilities

27.    On December 13, 2018, the Debtors entered into (i) that certain First Lien Revolving Credit Agreement with ACF FinCo I LP (the "First Lien Agent" and such facility, the "First Lien Revolving Credit Facility"), as administrative agent and collateral agent, and the lenders from time to time party thereto (the "First Lien Lenders"), and (ii) that certain Second Lien Credit Agreement with Ares Capital Corporation, as administrative agent (the "Second Lien Agent" and such facility, the "Second Lien Term Loan Facility") and the lenders from time to time party thereto (the "Second Lien Lenders").  The First Lien Revolving Credit Facility and the Second Lien Term Loan Facility are herein referred to as the "Senior Secured Credit Facilities."

28.    The Debtors' ability to borrow under the First Lien Revolving Credit Facility is subject to a borrowing base determined based upon eligible inventory, equipment, real estate and receivables.  As of the Petition Date, the First Lien Revolving Credit Facility was fully-drawn.

29.    The First Lien Revolving Credit Facility matures on September 30, 2022 and the Second Lien Term Loan Facility matures on December 29, 2022.  Collectively, the Senior Secured Credit Facilities are secured by substantially all of the Debtors' assets, and all of the Debtors' other debt is subordinated to the Senior Secured Credit Facilities. Further, the Senior Secured Credit

Facilities are secured by substantially all of the assets of the non-Debtor credit parties and obligors thereunder, including the Debtors' Luxemburg, Estonia, and Canada subsidiaries, which are borrowers or guarantors of such Senior Secured Credit Facilities.  The liens securing amounts advanced under the Second Lien Term Loan Facility are subordinate to the liens securing amounts advanced under the First Lien Revolving Credit Facility.  The relative rights of the First Lien Lenders and First Lien Agent, on the one hand, and the Second Lien Lenders and Second Lien Agent, on the other, are set forth in that certain Intercreditor Agreement, dated as of December 13, 2018, among Teligent as the Borrower, each of the other obligors party thereto, the First Lien Agent, and the Second Lien Agent.

30.    As of the Petition Date, the Debtors estimate that $15 million in principal, plus accrued and unpaid interest and fees in the amount of $1,441,527.34, is outstanding under the First Lien Revolving Credit Facility, and approximately $86.7 million in principal, plus accrued and unpaid interest and fees, is outstanding under the Second Lien Term Loan Facility.

> b.    *The Series A and Series B Notes*

31.    On April 27, 2018, Teligent entered into separate exchange agreements with certain holders of their then-outstanding senior notes due 2019 (the "2019 Notes"), pursuant to which the holders exchanged, in the aggregate, $75.1 million of the 2019 Notes for $75.1 million of senior notes due 2023 (the "Series A Notes").  The Series A Notes bore a fixed interest rate of 4.75% per year, payable semi-annually with the principal payable in May of 2023.

32.    On October 31, 2019, Teligent closed an offering of series-B convertible notes (the "Series B Notes") in the aggregate principal amount of $34.4 million.  The Series B Convertible Notes bore interest at the rate of 7.00% per annum (cash) or 8.00% per annum (PIK), at the Company's election, and were also scheduled to mature in May of 2023.

26732411.4

33.     The Series A Notes and Series B Notes were exchanged, in part, and ultimately cancelled through the issuance of the Series C Notes and Series D Notes (each as defined below).

c.      *The Series C Notes*

34.     On July 20, 2020, the Teligent closed the issuance of $13.8 million, in aggregate principal amount, of 9.5% Series C Senior Convertible Notes due 2023 (the "Series C Notes" and the holders thereof the "Series C Noteholders").  Teligent also issued approximately $32.3 million in aggregate principal amount of Series C Notes in exchange for approximately $35.9 million in aggregate principal amount, plus accrued but unpaid interest, of the Series B Notes, which gave effect to a 10% discount on the principal amount of Series B Notes exchanged.  In addition, Teligent issued approximately $3.7 million in aggregate principal amount of Series C Notes in exchange for approximately $8.2 million in aggregate principal amount, plus accrued but unpaid interest, of the Series A Notes, which gave effect to a 55% discount on the principal amount of Series A Notes exchanged.

35.     Teligent's remaining obligations under the Series C Notes were extinguished in connection with the January 2021 Exchange Transactions.

d.      *The Series D Notes*

36.     On September 23, 2020, Teligent issued approximately $27.5 million aggregate principal amount of Zero Coupon Convertible Senior Notes due 2023 (the "Series D Notes") in exchange for approximately $57.9 million in aggregate principal amount, plus accrued but unpaid interest, of the Series A Notes, which gave effect to a 52.5% discount on the principal amount of Series A Notes exchanged.  Teligent also issued approximately $400,000 in aggregate principal amount of Series D Notes in exchange for approximately $500,000 in aggregate principal amount, plus accrued but unpaid interest, of the Series B Notes, which gave effect to a 31% discount on the

principal amount of Series B Notes exchanged.  The Series D Notes do not bear interest and mature in May of 2023.

37.    The Series D Notes are convertible at the option of the holders (the "Series D Noteholders") at any time prior to maturity at an initial conversion price of $1.50 per share, subject to adjustment under certain circumstances.  If Teligent undergoes a "fundamental change," the Series D Noteholders may require it to purchase for cash all or any portion of the Series D Notes at the fundamental change purchase price equal to 100% of the principal amount of notes being repurchased plus accrued but unpaid special interest, if any, thereon.

38.    In connection with the issuance of the Series D Notes, the remaining outstanding Series A Notes and Series B Notes were cancelled.

39.    As of the Petition Date, the Debtors estimate that they owe approximately $296,943.06 on account of the Series D Notes.

    *e.*  *The PPP Loan*

40.    In May of 2020, the Company applied for and received approximately $3,349,094.12 of proceeds from the U.S. Small Business Administration Paycheck Protection Program, funded by Quaint Oak Bank.  Under the terms of the PPP Loan, amounts thereunder may be forgiven if certain conditions are met.  As of the Petition Date, the full amount of the PPP Loan remains outstanding; however, the Debtors anticipate that it will be forgiven.

    *f.*  *Trade Payables and Other Unsecured Claims*

41.    The Debtors also estimate that they have approximately $23,000,000.00 in trade payables and other general unsecured obligations outstanding as of the Petition Date.

## PART II

## EVENTS LEADING TO CHAPTER 11

**A.      The FDA Warning Letter**

42.      On November 26, 2019, Teligent Pharma Inc. ("Teligent Pharma") received a warning letter from the U.S. Food and Drug Administration (the "FDA") relating to the Buena Facility, as well as an additional comment letter from the FDA in August of 2020 (collectively, the "FDA Warning Letter").  The FDA Warning Letter resulted from an inspection held at the Buena Facility from April 2, 2019 to May 20, 2019 and identified a number of alleged violations of current good manufacturing practice ("CGMP") regulations for finished pharmaceuticals enacted by the FDA.  The FDA Warning Letter required Teligent Pharma to undertake remediation efforts to come into compliance with FDA regulations.

43.      At all times since the issuance of the FDA Warning Letter, the Company has worked diligently to address the identified issues in the timeframe required by the FDA.  This included a comprehensive product review, which was completed in December of 2020.  While the review did not identify material issues with many of the Company's products, it identified certain issues of non-conformance with respect to certain products, leading the Company to initiate recalls and halt the production of certain products subject to active review and remediation efforts.  As a result of the FDA Warning Letter, the Company was also prevented from launching a new sterile injectable product line to be produced at the Buena Facility.

44.      Further, the Company devoted significant time and resources to, among other things, providing the FDA with (i) detailed submissions outlining changes in its quality practices, (ii) additional documentation to support previous and ongoing independent assessments and remediation actions, (iii) updates regarding the Company's organizational structure, and (iv)

further detail regarding ongoing remediation projects, including comprehensive product quality assessments to ensure that all of the Company's products are safe, effective, and compliant.

45.     Entering the second quarter of 2021, the Company believed it had made substantial progress in remediating the issues identified in the FDA Warning Letter and anticipated informing the FDA of their inspection readiness during the third quarter of 2021. However, before they could do so, the FDA informed the Company that it would commence a periodic CGMP inspection and re-inspection to follow-up on the FDA Warning Letter in mid-July of 2021.

46.     The FDA conducted an inspection of the Buena Facility from July 12, 2021 to August 31, 2021.  Following the conclusion of the inspection, the FDA issued a Form FDA 483 setting forth the results of the inspection.  On September 22, 2021, Teligent Pharma responded to the Form FDA 483.

47.     As of the date hereof, the FDA Warning Letter has not been fully resolved and the Company's remediation efforts are ongoing.

48.     The substantial diversion of resources and uncertainty arising from the FDA's ongoing inspection and re-inspection has had a significant negative impact on the Company's business, financial position, results of operations and cash flow.  Further, the FDA's pre-approval inspection for commercial production on the newly installed injectable line at the Buena Facility has been delayed until such time as the FDA Warning Letter is fully addressed, limiting the Company's ability to produce and market new products and capitalize on the investments in the Buena Facility.

**B.     COVID-19 Pandemic and Response**

49.     Like other businesses throughout the United States, the Company was negatively impacted by the COVID-19 pandemic as well.  Beginning in March of 2020, the Company

executed a number of company-wide cost reduction initiatives targeted at eliminating discretionary spending and ensuring that its remaining expenditures lined up with the reduced demand for its products as a result of COVID-19.  For example, effective on May 4, 2020, the Company's Executive Leadership Team and all employees with annual salaries exceeding $100,000 accepted a 20% and 15% eight-week reduction in pay, respectively.  Over the same eight-week period, the Company furloughed part of its workforce at the Buena Facility.  Further, on May 15, 2020, the Company received the proceeds of the PPP Loan, which was utilized to balance the Company's previous employee-related actions with its ongoing business needs.

50.     Unfortunately, even with these cost-saving measures, the impact of the COVID-19 pandemic was significant and sustained throughout 2020, exacerbating the strain on the Company's operations and liquidity that resulted from the FDA Warning Letter.

51.     As a pharmaceutical manufacturer, the Company was considered "essential" under applicable directives from the State of New Jersey.  During the COVID-19 Public Health Emergency and State of Emergency, the Company thus maintained its manufacturing operations and monitored conditions to ensure a safe workplace for its employees. Among other preventative measures, during the height of the pandemic, the Company permitted employees to work remotely (if possible) in accordance with applicable guidelines, provided daily personal protective equipment, and implemented on-site social distancing measures, temperature monitoring services, and a more frequent sanitization process at the Buena Facility.  Around that time, the Company also re-aligned certain manufacturing-related resources with downward adjustments to their production schedule and, in order to preserve cash, initiated a reduction in force at the Buena Facility, effective June 19, 2020, terminating approximately fifty-three (53) employees and furloughing another fifteen (15).

52.     Lastly, as another cost-reduction measure, the Company shifted its research and development operations being performed in Tallinn, Estonia to the Buena Facility. On September 30, 2020, the Company sold certain assets located in Estonia, primarily lab machinery, equipment and office furniture, and subsequently wound-down all of its Estonian operations.

53.     Notwithstanding these efforts, the COVID-19 pandemic has continued to impact the Company's operations and liquidity throughout 2021.  By way of example, the COVID-19 pandemic resulted in a significant decrease in elective visits to dermatologists in the United States, which has led to a reduction in the volume of prescriptions written for topical products customarily supplied by the Debtors, which has, in turn, negatively impacted the Debtors' revenue.  While the easing of COVID-19 precautions has, to an extent, led to increased elective visits to dermatologists (relatively speaking), the sustainability of that trend is uncertain given the emergence of new strains of COVID-19 and the resurgence of social distancing precautions.

**C.      Other Financial Pressures Facing the Debtors**

54.     By letter dated August 31, 2021, the First Lien Agent informed the Company that it was establishing a "reserve" under the First Lien Revolving Credit Facility in the amount of $5,000,000 (the "Initial Reserve") due to, among other things, the Company's ongoing issues with the FDA.  Additionally, the First Lien Agent advised the Company that, as a result of the Initial Reserve, the Company's borrowing base and borrowing capacity under the First Lien Revolving Credit Facility were reduced by the amount of the Initial Reserve, the facility was over-advanced, and the Company was required to repay the amount of the Initial Reserve.  The Company paid such over-advance, which was applied to the obligations under the First Lien Revolving Credit Facility.

26732411.4

55.     By email dated September 20, 2021, the First Lien Agent informed the Company that it had established an additional reserve under the First Lien Revolving Credit Facility in the amount of $5,000,000 (the "Additional Reserve" and, together with the Initial Reserve, the "Reserves"), reduced the Company's borrowing base and borrowing capacity by the amount of the Additional Reserve and demanded payment of the Additional Reserve.  The Company paid such over-advance, which was applied to the obligations under the First Lien Revolving Credit Facility.

**D.      Discussions With Key Stakeholders Prior to the Petition Date**

56.     Taking into consideration the Debtors' outstanding debt under the Senior Secured Credit Facilities, the ongoing costs associated with the FDA Warning Letter and the related remediation efforts, and the ongoing operational and liquidity constraints resulting from the COVID 19 pandemic, in or about August of 2021 the Company determined to explore strategic alternatives.

57.     In September of 2021, the Company engaged: (i) Raymond James, to explore a potential sale of the Debtors' assets and (ii) Portage Point (a) to provide the CRO, an interim chief financial officer (the "Interim CFO"), and other personnel to assist the CRO and Interim CFO in carrying out their duties, and (b) as financial and restructuring advisor.

58.     Around the same time, the Company began negotiating with the First Lien Agent and the Second Lien Agent regarding the use of cash collateral and potential debtor-in-possession financing in connection with a potential Chapter 11 filing and sale of substantially all the Debtors' assets under section 363 of the Bankruptcy Code.

59.     As part of the consideration of potential strategic alternatives, Raymond James undertook a prepetition marketing effort, soliciting indications of interest for the sale of the Debtors' assets both on an integrated basis as well as on a piecemeal basis.  In particular, Raymond

26732411.4

James initiated the process of assembling detailed marketing materials and related diligence information for a confidential electronic data room and a confidential information memorandum with the assistance of the Debtors and their other professional advisors. Raymond James developed an initial list of more than 130 prospective purchasers that are strategic, financial, and hybrid purchasers. Raymond James circulated, via electronic mail, a detailed "teaser" and description of the opportunity to acquire the Debtors' assets to all of the prospective purchasers.

60.     Since the full launch of the sale process on October 10, Raymond James has been working with interested parties to execute a non-disclosure agreement (a "NDA"). Parties who execute an NDA will be provided with access to the confidential data room that presently contains more than 200 files covering more than 12,000 pages of information, a confidential information memorandum, and a process letter detailing the requirements and timing for delivery of both Non-Binding Indications of Interest and Executed Stalking Horse Bids. Raymond James will continue its marketing efforts subsequent to the Petition Date.

**E.      Appointment of the Independent Director**

61.     On October 8, 2021, Bradley Scher of Ocean Ridge Capital Advisors was appointed to the Board of Teligent, Inc. as an independent director.

**F.      The Debtors' Postpetition Financing**

62.     The Debtors require additional liquidity to fund their operations and the Chapter 11 Cases and to ensure a fulsome and value-maximizing sale process. The Senior Secured Lenders have agreed to provide DIP financing on the terms set forth in the DIP Motion to provide that liquidity. Accordingly, the Debtors, with the advice of their professional advisors, engaged in negotiations with the Senior Secured Lenders on the specific terms and amount of the DIP facility prior to the Petition Date.

63.     Based on my experience and knowledge of the Debtors' current capital structure, as well as the challenges of attempting to prime the liens and use the cash collateral of the Senior Secured Lenders without their consent (which neither would provide), obtaining third-party DIP financing was virtually impossible under the circumstances.  The Debtors could not have obtained financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents, and are similarly unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  As a result, the Debtors and their advisors focused on negotiating the best possible financing terms with the Senior Secured Lenders and commenced the Chapter 11 Cases seeking approval of the DIP Facilities described at length in the DIP Motion.

64.     The DIP Facilities consist of:

a) a postpetition senior secured debtor in possession asset based revolving credit facility in an aggregate principal amount of up to $6.0 million (the "DIP Revolving Credit Facility") provided by the prepetition First Lien Lenders, consisting of new money revolving loans, of which $3.0 million shall be available to the Debtors upon the entry of the Interim DIP Order;

b) a postpetition senior secured term loan facility, *pari passu* in priority to the DIP Revolving Credit Facility (the "DIP Senior Term Loan Facility"), consisting of rolled-up loans under the prepetition First Lien Revolving Credit Facility in an aggregate principal amount of $15.0 million, plus accrued and unpaid interest and fees in the amount of $1,441,527.34 and all other obligations under the prepetition First Lien Revolving Credit Facility (the "Prepetition First Lien Obligations");

c) a postpetition senior secured term loan facility junior only to the DIP Revolving Credit Facility, the DIP Senior Term Loan Facility, the First Lien Adequate Protection Obligations (as defined in the Interim DIP Order), and the Prepetition First Lien Obligations (the "DIP Junior New Money Term Loan Facility"), provided by certain prepetition Second Lien Lenders, consisting of up to $6.0 million in new money term loans, of which $3.0 million shall be available to the Debtors upon the entry of the Interim DIP Order; and

d) subject to the entry of the a Final DIP Order, a postpetition senior secured term loan facility *pari passu* in priority to the DIP Junior New Money Term Loan Facility and junior only to the DIP Revolving Credit Facility, the DIP Senior Term Loan Facility, the First Lien Adequate Protection Obligations (as defined in the Interim

DIP Order), and the Prepetition First Lien Obligations (the "Roll-Up Junior Term Loan Facility"), consisting of rolled-up loans under the prepetition Second Lien Term Loan Facility in an aggregate principal amount of $18.0 million, plus accrued and unpaid interest.

65.     Under the DIP Facilities, ACF FinCo I LP ("ACF") shall act as administrative agent and collateral agent (in such capacity, the "DIP Administrative Agent") and Ares Capital Corporation shall act as term loan agent ("ARCC" and, together with ACF, in such capacities, the "DIP Agents").  The DIP Facilities will be secured by superpriority liens on all of the Debtors' assets, on the priorities set forth more fully in the DIP Credit Agreement and Interim DIP Order, and will allow the Debtors to utilize cash collateral on a fully-consensual basis (subject to the limitations in the Interim DIP Order).  As detailed above, the DIP Facilities provide for a roll-up of (i) all of the Debtors' obligations under the First Lien Credit Agreement and (ii) subject to entry of the Final Order, a portion of the Debtors' obligations under the Second Lien Credit Agreement, respectively.

66.     The DIP Credit Agreement also establishes the following milestones, which may be waived or extended with the consent of the DIP Agents:

| EVENT | DUE DATE |
|---|---|
| Entry of Interim DIP Order | October 15, 2021 |
| Receipt of Non-Binding Indications of Interest | November 5, 2021 |
| Entry Final DIP Order | November 12, 2021 |
| Receipt of Executed Stalking Horse Bids | November 22, 2021 |
| Filing of Bidding Procedures Motion | November 23, 2021 |
| Entry of the Bidding Procedures Order | December 20, 2021 |
| Qualified Bid Deadline | January 11, 2022 |
| Auction | January 13, 2022 |
| Entry of Sale Order | January 17, 2022 |
| Sale Closing | January 31, 2022 |

67.     The Debtors have an immediate need to obtain the DIP Facilities and to use the Cash Collateral, in each case on an interim basis, in order to, among other things, (i) permit the orderly continuation of their respective businesses, (ii) maintain business relationships with their

vendors, suppliers, regulators, customers and other parties, (iii) make payroll, (iv) subject to paragraph 32 of the Interim DIP Order, repay in full any amounts outstanding under the First Lien Revolving Loan Facility with the proceeds of the DIP Senior Term Loans (as defined in the Interim DIP Order), (v) make adequate protection payments, (vi) pay the costs of the administration of the Chapter 11 Cases and the sale process, and (vii) satisfy other working capital and general corporate needs.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the value of the Debtors' assets.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facilities and authorized use of Cash Collateral

68.    I believe that the commercial terms of the DIP Facilities are reasonable and provide sufficient liquidity to fund the Chapter 11 Cases, conduct the sale process, and, ultimately, wind down the Debtors' affairs.  I also believe that approval of the DIP Facilities will instill much needed confidence in parties that are critical to the success of the Chapter 11 Cases, including the Debtors' employees, vendors, suppliers, and customers.  In addition, I believe the DIP Facilities will increase the opportunity for a robust, competitive postpetition sale process by facilitating the Debtors' efforts to preserve operations and their going-concern value during that process.  Without access to the DIP Facilities, the Debtors would be unable to avoid a value-destructive liquidation—which would result in irreparable harm to the Debtors and their stakeholders.

69.    The Debtors, with the assistance of their advisors, including Portage Point, have determined that the DIP Facilities will be sufficient to support the Debtors' operations through the

pendency of the Chapter 11 Cases and adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the DIP Budget.

70.     I believe the terms of the DIP Facilities reflect good faith, arms'-length negotiation among the Debtors and the Senior Secured Lenders.  Without access to the DIP Facilities, the Debtors would suffer immediate and irreparable harm, and the Debtors would likely be forced to liquidate.

71.     For all these reasons, I believe the DIP Facilities are necessary and appropriate, and essential to the Debtors' ability to conduct the Chapter 11 Cases for the benefit of their stakeholders.

## PART III

## SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

72.     Concurrently herewith, the Debtors filed the First-Day Motions seeking relief related to the administration of the Chapter 11 Cases, the Debtors' operations, and their cash and financing needs, to ensure a smooth entry into chapter 11.  I am familiar with the contents of each First-Day Motion (including the exhibits to such motions) and believe that the relief sought in each First-Day Motion: (i) will enable the Debtors to operate in chapter 11 with minimal disruptions; (ii) is critical to the Debtors' chapter 11 efforts; and (iii) best serves the interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First-Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above.  A list of the First-Day motions is set forth below:

    a.      *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

    b.      *Application of the Debtors for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date*

c.      *Debtors' Motion for Interim and Final Orders Authorizing: (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Superpriority Administrative Expense Status for Postpetition Intercompany Claims; and (E) Interim Suspension of Section 345(b) Deposit and Investment Requirements*

d.      *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), And 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

e.      *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief, Including Setting a Final Hearing Related Thereto*

f.      *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Foreign Vendors; (B) Domestic Critical Vendors; and (C) Lienholders; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Certain Related Relief*

g.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

h.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Employee Wages, Salaries, and Other Compensation; (B) Continue Employee Benefits Obligations and Pay Related Administrative Obligations; (II) Authorizing the Debtors to Pay and / or Honor any Workers' Compensation Obligations and Waiving the Automatic Stay as it Applies to Workers' Compensations Claims; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief*

i.      *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing Procedures for Trading in, or Certain Claims of Worthlessness With Respect to, Equity Securities in Debtor Teligent, Inc.*

j.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay;(IV) Scheduling Final Hearing; and (V) Granting Related Relief*

73.    The Debtors have narrowly tailored the First-Day Motions to meet the goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (ii) maintaining the confidence and support of key customers, vendors and suppliers during the Chapter 11 Cases; and (c) establishing procedures for the efficient administration of the Chapter 11 Cases and a robust marketing and sale process.

74.    I have reviewed and discussed with counsel each of the First-Day Motions (including the exhibits thereto), and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records and advisors.  I incorporate by reference the factual statements set forth in each of the First-Day Motions as though set forth herein.

75.    It is my belief that the relief sought in each of the First-Day Motions is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates.  It is my further belief that, with respect to those First-Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain operations in the ordinary course postpetition and maximize estate value.  The relief requested in the First-Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful sale.

## <u>CONCLUSION</u>

76.     In conclusion, for the reasons stated herein and in each of the First-Day Motions, I respectfully request that each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed:  October 14, 2021

*/s/ Vladimir Kasparov*
Vladimir Kasparov
Chief Restructuring Officer

## EXHIBIT A

**Corporate Organizational Chart**

**Teligent, Inc.**
**Corporate Organizational Chart**
**10/14/2021**



**Teligent, Inc. (USD)**

(Delaware)
01-0355758

**Igen, Inc. (USD)**
**100% Teligent, Inc.**

(Delaware)
51-0297443

Microburst Energy Inc.
95% Teligent Inc., 5% Outsider

(Delaware)
06-1561054

Teligent Luxembourg S.ar.l.

(EUR)
100% Teligent

**Teligent Pharma, Inc. (f/k/a IGI Laboratories, Inc.)**
**100% Igen, Inc.**

(Delaware)
52-1521639

Blood Cells Inc.
90% Igen, Inc., 10% Outsider

(Delaware)
23-3176246

Flavorsome Ltd.
50% Igen, Inc., 50% Outsiders

(Delaware)
22-3339680

Teligent Canada Inc.
100% Teligent Luxembourg S.a.r.l.

(CAD)

Teligent OU
100% Teligent Luxembourg S.a.r.l.

(EUR)

**TELIP LLC**

(Delaware)
87-1228395

Debtor

Non-Debtor

28706689.1